UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KARIM WATSON AND KIMBERLY ESPINO, | ) ) ) | CIVIL ACTION |
| Plaintiffs, | ) ) ) | NO. 4:15-CV-40014-TSH |
| v. | ) ) ) |  |
| LUIS PEREZ, SHERRI GLENN, STEPHEN DONOVAN, DANIEL DISTEFANO, DAVID DEIGNAN, TIMOTHY O'LEARY, ROBIN YANCEY, AND DANIEL BENNETT, | ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## MEMORANDUM AND ORDER ON DEFENDANTS' PARTIAL MOTION TO DISMISS
(Docket No. 31)

**March 11, 2016**

Kimberly Espino and Karim Watson (collectively, Plaintiffs) brought this civil rights action against various Worcester County court officers, as well as the Regional Security Director and a former First Assistant District Attorney, following a physical altercation between Watson and various officers at the Worcester District Court. The Defendants move to dismiss in part and to stay any remaining claims until the resolution of related criminal charges that are currently pending against the Plaintiffs in state court. For the reasons set forth below, Defendants' motion (Docket No. 31) is ***granted*** in part and ***denied*** in part. The remaining claims are ***stayed*** pending resolution of the state criminal charges.

1

**Background**

The following facts are taken from Plaintiffs' First Amended Complaint and assumed true for the purposes of this motion. Karim Watson and Kimberly Espino are married. On January 26, 2012, they were sitting in the gallery of Courtroom 24 of the Worcester District Court. Watson was using an electronic tablet. Luis Perez, a court officer, told him he would have to leave the courtroom unless he put the tablet away. Although Watson started to put the tablet away, Perez told him to leave the courtroom anyway. Watson placed the tablet and his other belongings on the bench where he was sitting, got up, and walked toward the doors to exit the courtroom. Espino picked up Watson's belongings and followed him. Watson exited the first set of doors, which led to an anteroom attached to two side conference rooms. The door at the other side of the anteroom led to the courthouse's common hallway. Perez and another court officer, Daniel DiStefano, followed Watson through the first set of doors.

As Watson reached to open the door to exit into the common hallway, Perez, without provocation, sharply shoved Watson's right side with his elbow. Watson lost his balance and fell to the ground. Perez punched him on his side with a closed fist. DiStefano and another court officer, Stephen Donovan, roughly grabbed Watson's arms and legs and dragged him into one of the side conference rooms. Perez continued to punch Watson with a closed fist as he was being moved. DiStefano and Donovan then held Watson face-down on the floor and wrenched his hands behind his back, while Perez repeatedly struck Watson's side, head, and back. Watson did not resist the officers. Watson has only one lung, and he was suffocating because his face was pressed into the carpet. He yelled, "I can't breathe," and "you're hurting me." Perez, DiStefano, and Donovan continued to restrain and assault him. Watson was crying in pain, bleeding, and unable to breathe. Two other officers, Timothy O'Leary and David Deignan, "assisted by restraining

Watson in a rough and physically harmful manner" and "failed to intervene to terminate the assault and excessive force." (Docket No. 25 at ¶ 28.) Watson suffered a laceration to his forehead that was bleeding freely down the side of his face, as well as abrasions on his face and body, and emotional injury. His glasses were broken and bloodied.

Espino, who was visibly pregnant, was standing near the other conference room while Watson was being beaten and suffocated. She was out of the way of the court officers but close enough that she could see what was happening and hear Watson's cries of pain and his inability to breathe. She begged the officers to stop beating him, but they ignored her. She began to record the event on her cell phone. She held the phone up in an open and obvious manner and said to the officers that she was "recording this brutality; the beating that you guys are doing to my husband." (Docket No. 25 at ¶ 33.) Espino made the recording on a phone that had been issued to her by her workplace. She recorded for approximately two minutes.

Another court officer, Sherri Glenn, arrived on the scene while Espino was recording. Glenn, seeing that Espino was holding her phone so as to suggest that she was recording the scene, told Espino to leave the area. Espino did not want to leave because she was concerned about Watson's safety. Glenn grabbed Espino's arm, causing her pain, and forced her out of the area. Glenn ordered Espino to sit on a bench next to the courtroom. While she was sitting on the bench, Espino reviewed the contents of her phone and confirmed that the recording had been preserved.

The Regional Security Director, Robin Yancey, arrived, and Glenn told her that Espino had recorded the beating of Watson. Espino announced that she was leaving, that she had recorded Watson's beating, and that she would return with a lawyer. Yancey told Glenn to arrest Espino. Espino was charged with Disrupting Court Proceedings, Resisting Arrest, and Disorderly Conduct. She was held in custody and arraigned later that day in Worcester District Court. As a result of

these criminal charges, Espino lost her job as a bus driver, which she had held for three years. Espino was later indicted[1] on the same three misdemeanor offenses.

Watson was also arrested and charged with Disrupting Court Proceedings, Assault and Battery on a Public Employee, Resisting Arrest, and Disorderly Conduct. He was incarcerated for three weeks and then released on bail.

After Espino was arrested, her cell phone and other personal items were taken from her by Worcester County court officers and given to Yancey. On or about the day of Espino's arrest, then-First Assistant District Attorney Daniel Bennett was informed of the incident. He directed Yancey to take custody of Espino's cell phones, including the phone that she had used to record the assault and battery.[2] At Bennett's direction, Yancey held Espino's phone in her office for approximately three months. During this time, Yancey and Bennett had several communications regarding the phone. The Worcester County District Attorneys' Office did not apply for a warrant to search the phone's contents.

Then, without explanation, Bennett authorized Yancey to coordinate with Espino, Espino's attorney, and the prosecuting attorney to return the phone to Espino in her counsel's presence. Espino had made frequent requests for the return of her phone, to no avail, during the three months when Yancey was holding it. During the arranged meeting, the phone was powered up, and Espino saw that its entire contents had been erased. This phone had been in her possession for approximately three years. It contained contacts and photos, as well as the video footage of Watson's beating.

---

[1] According to the complaint, she was indicted, and "First Assistant Daniel Bennett conceded that he had no knowledge of any misdemeanor indictments during his ten year tenure in the Worcester Countary District Attorneys' Office." (Docket No. 25 at ¶ 47.)

[2] It seems that Espino had two phones with her when she was arrested; her work phone, on which she recorded the alleged beating, and a personal phone.

On January 24, 2015, Plaintiffs brought the instant lawsuit in this Court. They filed their First Amended Complaint (the complaint) on October 1, 2015, alleging the following counts: excessive force in violation of the Fourth and Fourteenth Amendments by Perez, DiStefano, Donovan, Glenn, O'Leary, and Deignan (count I); failure to intervene to stop the assault on Watson by Donovan, Glenn, O'Leary, and Deignan (count II); assault of Watson by Perez, DiStefano, Donovan, O'Leary, and Deignan, and assault of Espino by Glenn (count III); battery of Watson by Perez, DiStefano, Donovan, O'Leary, and Deignan, and battery of Espino by Glenn (count IV); false/wrongful arrest by Perez, DiStefano, Donovan, Glenn, O'Leary, Diegnan, and Yancey (count V); intentional infliction of emotional distress by Perez, DiStefano, Donovan, Glenn, O'Leary, and Deignan (count VI); conspiracy to conceal and/or cover up civil rights violations by Yancey and Bennett (count VII).

On November 13, 2015, all eight Defendants moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants further request that any remaining claims be stayed until the termination of the pending state criminal charges.

## Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011).

In evaluating a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000). It is a "context-specific task" to determine "whether a complaint states a plausible claim for relief," one that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). On the other hand, a court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.

## Discussion

1. <u>Count I: Excessive Force</u>

This claim is properly analyzed under the Fourth Amendment reasonableness standard rather than the Fourteenth Amendment due process standard, because the alleged force occurred pursuant to an arrest. When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment," which protects against unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Here, there is no question that both Espino and Watson were seized and arrested by the court officers. *See id.* at 395 n.10; *Terry v. Ohio,* 392 U.S. 1, 19, n.16 (1968).

The pertinent inquiry under the Fourth Amendment standard is whether the amount of force was objectively reasonable. *See Graham*, 490 U.S. at 396. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful

balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (citation omitted). It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* "Whether the force used to effect a particular seizure is reasonable 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007) (quoting *Graham*, 490 U.S. at 396).

Thus, the reasonableness inquiry is specific to the facts of each case. *Graham*, 490 U.S. at 396. Reasonableness is determined "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Jennings*, 499 F.3d at 11 (quoting *Graham*, 490 U.S. at 397). Relevant facts include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "Although the severity of the injury also may be considered, . . . a 'serious injury' is not a prerequisite to recovery." *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002) (citations omitted).

Here, Plaintiffs have not pled a colorable excessive-force claim against Glenn, because she grabbed Espino's arm to escort her away from Watson and the other officers. This level of contact does not constitute excessive force under the circumstances. When Glenn arrived, she first told Espino to leave the area and then used a grip on her arm to escort her to a bench. This force was minimal, did not result in injury, and was necessary to effectuate the removal of Espino from the immediate area. There are no allegations that Glenn had additional physical contact with Espino or Watson. Accordingly, the excessive force claim against Glenn is dismissed as to both Plaintiffs.

Regarding Deignan and O'Leary, the complaint alleges only that they "assisted by restraining Watson in a rough and physically harmful manner." (Docket No. 25 at ¶ 28.) This vague allegation, without more, is not sufficient to maintain a plausible excessive force claim against these officers. There are no allegations that Deignan or O'Leary had any physical contact with Espino. The excessive force claims against Deignan and O'Leary are also dismissed as to both Plaintiffs.

Defendants clarified at oral argument that they do not seek to dismiss the excessive force claims against Perez, DiStefano, and Donovan. Accordingly, count I is dismissed as to Glenn, Deignan, and O'Leary; but not dismissed as to Perez, DiStefano, and Donovan.

2. *Count II: Failure to Intervene*

Defendants have not made any arguments, in their papers or during the hearing, regarding count II. Accordingly, to the extent that their motion applies to this count, it is denied.

3. *Counts III, IV and VI: Assault, Battery, and IIED*

Defendants argue that the claims for assault, battery, and IIED are deficient because the applied force was reasonable and justified. Under Massachusetts law, plaintiffs may maintain "assault and battery claims against police officers who use excessive force in conducting an arrest." *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) (citing *Powers v. Sturtevant,* 85 N.E. 84, 84 (Mass. 1908)). "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest: reasonable force is a valid defense to assault and battery." *Id.* When "a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery

claims." *Id.* Similarly, the IIED claims must fail if the officers' conduct was objectively reasonable under the circumstances. *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991).

Thus, the excessive-force analysis applies to the assault, battery, and IIED claims. These claims are dismissed as to Espino, because there was no unreasonable force exerted against her. Watson's claims against Glenn, O'Leary, and Deignan are dismissed. Watson's claims against Perez, DiStefano, and Donovan are not dismissed.

   4.  *Count V: Wrongful Arrest*

It is undisputed that Plaintiffs were arrested without warrants. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* (citation omitted).

Defendants do not address the issue of whether the complaint sufficiently alleges that the officers lacked probable cause to arrest Plaintiffs. Rather, they only challenge the complaint's lack of specificity as to the identities of the arresting officers. Regarding Espino's arrest, the complaint alleges that Glenn was the arresting officer, and that she conducted the arrest pursuant to Yancey's command. As for Watson, the facts of the scuffle alleged in the complaint show that Perez, DiStefano, Donovan, O'Leary, and Deignan all participated, in varying degrees, in restraining Watson. Although Plaintiffs have not alleged which officer's name appeared as the arresting officer for Watson's charges, the facts show that the five above-named officers participated in the event. Defendants' motion is denied with regard to count V.

5. *Count VII: Conspiracy to Cover Up Civil Rights Violations*

This claim is premised on the theory that Yancey and Bennett agreed to have Yancey delete the material on Espino's cell phone before returning it to her. Defendants argue that Plaintiffs' allegations are insufficient to plausibly support this claim because the complaint does not contain facts to show an agreement between Yancey and Bennett.

A traditional civil rights conspiracy claim under § 1983 involves an agreement to deprive an individual of a federally-secured right, resulting in damages. "A civil rights conspiracy [is] commonly defined is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008) (quoting *Earle v. Benoit,* 850 F.2d 836, 844 (1st Cir. 1988)). "To demonstrate conspiracy under § 1983, plaintiff must show 'an actual abridgement of some federally-secured right.'" *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 14 (1st Cir. 2003) (quoting *Nieves v. McSweeney,* 241 F.3d 46, 53 (1st Cir. 2001)).

Here, Plaintiffs allege that Yancey and Bennett conspired to delete the material on Espino's phone, which allegedly contained a record of the abusive assault on Watson. These facts suggest a so-called "cover-up" claim; a conspiracy to cover up a past violation of a constitutional right. For such a claim to be successful, the cover-up must result in an independent constitutional violation—such as interfering with a plaintiff's ability to seek judicial redress. *See Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980); *Correia v. Town of Framingham*, 969 F. Supp. 2d 89, 98 (D. Mass. 2013); *Shea v. Porter*, No. CIV.A. 08-12148-FDS, 2013 WL 1339671, at *5 (D. Mass. Mar. 29, 2013); *Gonsalves v. City*

*of New Bedford*, 939 F. Supp. 921, 925-27 (D. Mass. 1996). Plaintiffs have not alleged that any constitutional deprivation resulted from the loss of data on Espino's cell phone. Thus, to the extent that this claim is construed as a cover-up claim under § 1983, it is not sufficiently pled.

If the claim is construed as a traditional § 1983 conspiracy claim, it fails for the same reason. Plaintiffs have not alleged that the act of deleting the data on Espino's phone violated Plaintiffs' constitutional rights. Moreover, the complaint does not alleged sufficient facts to show an agreement between Bennett and Yancey to delete the data. The complaint alleges that Bennet told Yancey to hold on to Espino's phone, and that she did so for approximately three months. During this time, "Bennett and Yancey had numerous discussions about the phone and applying for a search warrant for the phone," but no warrant was issued. (Docket No. 25 at 18, ¶¶ 73-74.) Plaintiffs further allege that "Yancey and Bennett had several communications regarding the phone and its custody with Yancey." (Docket No. 25 at ¶ 52.) Then, Bennett authorized Yancey to return the phone to Espino, in the presence of her attorney and the prosecuting attorney; when the phone was returned, Espino discovered that it had been erased.

Although "conspiracy is a matter of inference," a plaintiff must present some facts to show an agreement between the conspirators. *Estate of Bennett*, 548 F.3d at 178. Here, even if Plaintiffs have succeeded in inferring that Yancey could have been responsible for wiping the phone— because it was in Yancey's custody and Yancey, as the Regional Security Director, had an incentive to conceal evidence of her officers' wrongdoing—there is nothing to show that she and Bennett agreed on this course of conduct. The general allegation that Bennett and Yancey had communications regarding the phone is not sufficient to make such an inference. Accordingly, count VII is dismissed.

6. *Whether the Remaining Counts Should be Stayed*

Lastly, Defendants argue that any surviving counts should be stayed until the state criminal charges against Watson and Espino are terminated. Defendants cite to *Heck v. Humphrey*, 512 U.S. 477 (1994), in which the Supreme Court held that a § 1983 claim is barred when there has been a state-court conviction, which has not been invalidated, and the § 1983 claim, if proved, would invalidate the conviction by implication. *Id.* at 486-87. This argument is premature because neither Watson nor Espino have been convicted in state court.

Nevertheless, the remaining claims should be stayed until resolution of the state court action under principles of abstention. In *Younger v. Harris*, 401 U.S. 37, 41-44 (1971), the Supreme Court established the rule that federal courts generally must abstain from enjoining pending state court prosecutions. The same principles apply to federal suits for declaratory relief. *Samuels v. Mackell*, 401 U.S. 66, 73 (1971). The First Circuit has applied these principles to § 1983 actions that would have the same effect as an injunction or declaratory judgment with regard to a pending state court prosecution. *Rossi v. Gemma*, 489 F.3d 26, 37-38 (1st Cir. 2007); *Landrigan*, 628 F.2d at 743. "[A] § 1983 damages award may interfere with a state proceeding because it can have the same practical effect as a declaratory judgment: the federal court has produced a ruling on the merits that the federal plaintiff can then use to alter the state proceeding." *Rossi*, 489 F.3d at 37. The Supreme Court has supported this concept:

> If a plaintiff files a false-arrest claim before he [or she] has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended.

*Wallace v. Kato*, 549 U.S. 384, 393-94 (2007); *see also Heck*, 512 U.S. at 487 n.8 ("abstention may be an appropriate response to the parallel state-court proceedings"). These principles apply

to the case at hand because Plaintiffs' claims arise from the events that led to their state-court charges. Accordingly, the remaining claims are stayed pending resolution of those charges.

### Conclusion

For the reasons set forth above, Defendants' motion to dismiss (Docket No. 31) is ***granted*** in part and ***denied*** in part, as follows:

Count I: the motion is ***granted*** as to Glenn, Deignan, and O'Leary; the motion is ***denied*** as to Perez, DiStefano, and Donovan.

Count II: the motion is ***denied***.

Counts III, IV, and VI: the motion is ***granted*** as to Glenn, Deignan, and O'Leary; the motion is ***denied*** as to Perez, DiStefano, and Donovan.

Count V: the motion is ***denied***.

Count VII: the motion is ***granted***.

The remaining portions of counts I-VI are hereby ***stayed*** pending resolution of the related state court actions.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**